UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| A.R.H. (XXX-XX-3395) | CIVIL ACTION NO. 15-cv-2041 |
| VERSUS | JUDGE HICKS |
| U.S. COMMISSIONER SOCIAL SECURITY ADMINISTRATION | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

Plaintiff was born in 1980, and he has a high school education and unskilled or semi-skilled work experience in jobs such as short order cook and office assistant. Plaintiff has never been psychiatrically hospitalized, but he has received therapy and medication for mental health issues, and he has a history of conflict with supervisors and being fired from multiple jobs.

Plaintiff filed applications for disability-related benefits based on an alleged onset date of February 8, 2012. ALJ Kelley Day held a hearing, reviewed the evidence, and issued a written decision that denied the claim. The Appeals Council denied a request for review. Plaintiff then filed this civil action to seek judicial review under 42 U.S.C. § 405(g). For the reasons that follow, it is recommended that the Commissioner's decision be reversed and the case be remanded for further proceedings.

**Relevant Facts**

Plaintiff (then 33) and his mother, a Shreveport attorney, testified at the hearing. The evidence showed that Plaintiff had moved to Georgia (where his father lives) after graduating high school. He was arrested for burglarizing cars and spent seven months in jail. He held several jobs, but they all ended after a short stint. Plaintiff's mother said that she eventually persuaded him to return to Louisiana and live with her.

Plaintiff's mother testified that her son had been in special education classes throughout his academic career. When Plaintiff returned to Louisiana to live with his mother about two years earlier, she had him examined by friends who were counselors, and they referred Plaintiff to Dr. Kimberly Law, a psychiatrist. Dr. Law did not see any evidence of bipolar disorder or schizophrenia, but she began trying different medications. Plaintiff's mother said that, after about two months, the medication was balanced, and it was like Plaintiff was a little kid again, sweet and childlike. That happened in about February 2012, the same as the alleged onset date. Plaintiff testified that once he got on the proper medication his outbursts stopped completely. He listed his drugs as Lithium, Clonazepam, Hydroxyzine, and Fluoxetine. Tr.195. He said he suffered from side effects of drowsiness, but he was able to drive.

Plaintiff testified that he had recently held a job at Applebee's and at a business called The Office, both times as cooks, but the jobs soon ended because he was too slow in filling orders. Plaintiff said that when work got busy he would start shaking and get very frustrated.

He was able to do a little work at his mother's office, which consisted of about 10 hours a week witnessing documents, filing papers at the courthouse, and cleaning the office on Friday. Plaintiff had once been married and had a child, but he relinquished all parental rights and no longer had any connection to his former family. He lived on his own briefly in Shreveport, but he returned to live with his mother after she was diagnosed with breast cancer.

Psychologist T. L. Malone, Ph.D., conducted a mental status examination of Plaintiff in October 2012. Dr. Malone interviewed Plaintiff and reviewed his treatment records from Dr. Law. Plaintiff reported that he got along with others most of the time but would lash out and become rude and short-tempered. He was then working about two days a week for his mother. He described difficulty in maintaining prior jobs; in 2010 he had 10 jobs that he left or was terminated from. Plaintiff was able to do chores around the house such as cleaning, loading dishes, and sweeping. He was able to cook, use a computer, and drive, and he enjoyed playing video games.

Treatment records show that Dr. Law prescribed a number of medications, and Plaintiff was having daily therapy sessions with Ronald Kee. Dr. Malone wrote that Plaintiff's prognosis seemed fair but guarded. He diagnosed intermittent explosive disorder, personality disorder NOS (obsessive-compulsive traits), and assigned a GAF score of 61 (some mild symptoms). Malone opined that Plaintiff "would likely be able to work in a low-

stress environment with simple tasks and limited social interaction." He added that Plaintiff "is able to carry out tasks of 2-3 hours over the course of the work week." Tr. 253-55.

The Agency asked for a consultative opinion from psychiatrist Barbara J. Felkins, M.D., who reviewed the available records but did not examine Plaintiff. She answered written interrogatories posed by the ALJ. One of the interrogatories asked if there was sufficient objective medical evidence to allow her to form an opinion of the claimant's medical status. Dr. Felkins responded, "No I will give an opinion on what is available". She added: "No therapy notes mentioned 6F/2 and 6F/5 treating doctor states that she completed a disability form not in record No MER (medical evidence of record) after 12-12 except vague script diagnosis." When asked if there were conflicts in the medical evidence that affected her opinion, Dr. Felkins pointed out that some evaluations listed a GAF score of 60, but the claimant's mother reported behavior consistent with a lower GAF (which would indicate more serious symptoms). Also, a state agency examiner said that Dr. Malone diagnosed moderate mental retardation, but Dr. Felkins did not see that in the report.

Dr. Felkins was asked to list the specific mental functional limitations imposed by the claimant's impairments during the relevant time. She referred to an earlier answer and wrote: "Note much MER missing." The earlier answer was with respect to whether the claimant met the requirements of a listing in the regulations. Dr. Felkins had written, "Not with current MER." She added that she doubted the assertion of mental retardation due to the claimant having a driver's license and holding jobs in the past. There had been some

mention of Aspergers syndrome, and Dr. Felkins wrote that it is diagnosed more on developmental history and family report that was not done during the earlier consultative examination or psychiatric evaluation. She said that it is common for psychiatrists to miss Aspergers because they see the person alone. She continued that there was a lack of history from the time spent with the father and why he had returned to live with the mother. All that was known, she wrote, was that a 30-year-old man had a history of multiple jobs in the restaurant business, a temper problem, and a learning disorder. She said that his IQ "could be" 70 or 68. He also "could be" Aspergers or just personality disorder. She said that it would help to have a disability report from Dr. Law or additional medical records after 12-12, history from the father, and/or IQ testing. Tr. 294-99.

Dr. Felkins also completed a form regarding ability to do work-related activities. She found no limitation in the ability to remember and carry out simple instructions, but she found marked limitation in the ability to understand, remember, and execute complex instructions. She attributed those limitations to dyslexia. She found only a moderate limitation in the abilities to interact appropriately with the public, supervisors, and co-workers, as well as the ability to respond appropriately to usual work situations. She wrote that her indication of moderate meant satisfactory, and "He would need a work environment in which contact with public & co-workers would be incidental to the work performed." Tr. 300-03.

Psychologist Cheryl Marsiglia, Ph.D., evaluated Plaintiff in October 2013. That was after the June 2013 hearing and before the ALJ issued her decision in February 2014, but the Marsiglia report did not make it into the record before the ALJ. This is likely because Plaintiff was represented at that stage by a local attorney who was suffering from terminal cancer at the time. The report was presented to the Appeals Council.

Dr. Marsiglia interviewed Plaintiff and his mother, and she administered IQ tests and several others. She recorded that Plaintiff had been in special education through his schooling, but his mother said she had to "re-teach him every night." Plaintiff was said to have a good work ethic and not miss work, but he had been dismissed from several jobs due to slow processing speed, misreading social cues, and other social problems. Several relationships had ended with some type of aggression or domestic violence incidents. Dr. Marsiglia stated that Plaintiff had vocabulary and fund of information indicative of cognition in the borderline to low average range. Plaintiff's mother said there had been a previous diagnosis of mild mental retardation, which was said to appear to be erroneous. This was backed by an IQ test score of 91, which is in the average range.

Plaintiff had similar scores in verbal comprehension and perceptual reasoning. He also scored in the average range on tests for attention and executive functioning, but he showed rather severe impairments in tests designed to measure memory and expressive language tasks. He also scored poorly on social perception tests that were designed to measure his ability to read emotions and show empathy. Dr. Marsiglia stated that this was

consistent with an autism diagnosis. Testing showed that Plaintiff's processing speed was somewhat lower than normal, which suggested that he would struggle to keep up with all types of instruction. Any situation with a time pressure would be challenging.

Dr. Marsiglia's diagnosis included autism disorder, mood disorder, ADHD, and a GAF score of 60. She concluded that Plaintiff would need considerable support to successfully live on his own. His psychiatric history was remarkable for an autism diagnosis, and he would need "repeated exposure, step-by-step directions, and prompting for adaptive skill acquisition and automation." She found that his symptoms included ritualistic behaviors, and he would become upset when routines are changed. He lacked social interaction skills and "lacks the ability to negotiate even simple interactions."

Dr. Marsiglia encouraged Plaintiff to apply for disability benefits due to what she described as pervasive and marked impairments in areas such as social interaction. She also recommended an agency that provides supportive living arrangements because Plaintiff "will need significant supports in place if he is to successfully live independently." Tr. 304-15.

**Summary of the ALJ's Decision**

The ALJ analyzed the claim pursuant to the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 (governing claims for disability insurance benefits) and § 416.920 (parallel regulations governing claims for Supplemental Security Income) and described in Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). She found that Plaintiff had not engaged in substantial gainful activity since his onset date (step one) and that he had the

following severe impairments (step two): intermittent explosive disorder, obsessive-compulsive disorder, personality disorder, and unspecified learning disorder. She found that the impairments were not so severe as to meet or equal the severity of one of the listed impairments in the regulation (step three), which would require a finding of disability without further analysis.

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"), which is the most the claimant can do despite his limitations. She found that Plaintiff could perform the full range of work at all exertional levels, but with the following non-exertional limitations: no exposure to unprotected heights or dangerous moving machinery; can understand, remember and carry out simple instructions; and can have occasional contact with co-workers and supervisors, but no contact with the public. Occasional means up to one-third of the workday.

At step four, the ALJ accepted the testimony of a vocational expert ("VE") that Plaintiff's RFC would not let him perform the demands of his past relevant work. Step five asked whether the claimant can perform the demands of other jobs that exist in significant numbers in the economy. The VE testified that a person with Plaintiff's age, education, and RFC would be able to perform the requirements of jobs such as laundry laborer, leaf sticker, poultry boner, floor waxer, housekeeper/cleaner, and table worker. The ALJ accepted that testimony and found at step five that Plaintiff was not disabled within the meaning of the regulations.

**Issues on Appeal**

Plaintiff lists five issues for appeal, all of which in some way challenge the basis for the ALJ's finding of Plaintiff's RFC. The issues are: (1) The Commissioner did not fully and fairly develop the record; (2) The Commissioner erred in placing significant weight on Dr. Felkins' answers when Dr. Felkins said she did not have sufficient medical evidence; (3) The Commissioner erred in failing to find that Dr.Marsiglia's report provided the information that Dr. Felkins said was necessary; (4) The Commissioner erred in failing to include autism disorder, mood disorder, and ADHD within the step two severe impairments; and (5) The Commissioner erred in ignoring Dr. Malone's opinion that Plaintiff had the ability to carry out the ability to carry out tasks of 2-3 hours over the course of the work week and could work only in low stress environments.

**Standard of Review; Substantial Evidence**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990). "Substantial evidence is more than a scintilla and less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is justified only if there are no credible evidentiary choices or medical findings which support the ALJ's determination. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).

**Analysis**

The ALJ reviewed and weighed the competing medical evidence when assessing Plaintiff's RFC. She afforded "limited weight" to Dr. Malone's opinion because his statement that Plaintiff would be able to carry out tasks of 2-3 hours over the course of the work week was said to be confusing and not otherwise supported by the record. The ALJ opined that Plaintiff could handle simple tasks for an entire workday, and she stated that the limitations suggested by Malone were less than what Plaintiff himself testified he does regularly.

The ALJ reviewed the report of Dr. Felkins and afforded it "significant weight" because it was considered consistent with the medical and testimonial evidence as a whole. She noted that Dr. Felkins said she was not sure if Plaintiff had Aspergers or just a personality disorder, but she did not note Dr. Felkins' fairly strong statement that she believed the medical evidence of record to be insufficient to form an opinion. The ALJ focused on Dr. Felkins' statement that Plaintiff could understand and carry out simple instructions and had only moderate/satisfactory limitations in interacting with others. Tr. 20-21.

The ALJ did not have the benefit of Dr. Marsiglia's report, but it was filed with the Appeals Council. Tr. 5. Plaintiff's request for review argued that the ALJ failed to consider all of his impairments and did not give adequate weight to the opinion of Dr. Malone. Tr. 9. The Appeals Council stated that it had considered the reasons Plaintiff disagreed with the

decision and the additional evidence presented, but it found no reason to review the ALJ's decision. Thus, the request for review was denied without any particular discussion of Dr. Marsiglia's report or the other relevant evidence. Tr. 1-2.

When the Appeals Council denies a request for review, that denial becomes part of the Commissioner's final decision that this court reviews under the substantial evidence standard. Higginbotham v. Barnhardt, 405 F.3d 332 (5th Cir. 2005). The Appeals Council is obligated under the regulations to evaluate this new evidence, but the regulations do not require the Council to discuss the new evidence or give reasons for denying review. Whitehead v. Colvin, 820 F.3d 776, 780 (5th Cir. 2016).

That said, if the Appeals Council does not discuss the new evidence, then the court may be unable to determine, considering the record as a whole, whether substantial evidence supports the ALJ's denial of benefits. The court should not be put in the position of weighing the unaddressed evidence and, in effect, deciding *de novo* its weight and effect on the case. In some cases the new evidence will be so contradictory as to clearly require reversal, and in others the new evidence will not be significant or contradictory enough to require judicial relief. Other cases fall in the middle, where the new evidence creates considerable uncertainty that has not been addressed or resolved by an agency level factfinder. Reversal and remand is often appropriate in such circumstances. Sun v. Colvin, 793 F.3d 502, 510-13 (5th Cir. 2015).

The undersigned is of the opinion that the absence of any discussion of Dr. Marsiglia's thorough report and its indication of quite serious limitations deprives the Commissioner's decision of substantial evidence to support it. There may be arguments and explanations as to why other evidence is more probative or relevant, but those are positions to be taken by the ALJ/Agency and then reviewed by the court under the Section 405(g) standard. The only explained decision from the Agency came from the ALJ, and it relied heavily upon the report of Dr. Felkins, who stated clearly that she did not believe she had adequate medical evidence of record to support a solid opinion. The report from Dr. Marsiglia includes some of the tests and details that Dr. Felkins found lacking, and it suggested that Plaintiff is in some respects more limited than found by Dr. Felkins or as assessed in the ALJ's RFC. This is supported by the undisputed evidence that Plaintiff has tried time and again to work in numerous jobs and been fired for the sort of shortcomings found by Dr. Marsiglia.

The court does not hold that Dr. Marsiglia's report requires a different result, but under these circumstances it at least requires serious consideration by the fact finder before appropriate appellate review can be conducted. The agency may consider other evidence as well. 20 C.F.R. § 404.983 (following a federal court remand, "[a]ny issues relating to your claim may be considered by the administrative law judge whether or not they were raised in the administrative proceedings leading to the final decision in your case."). See also Social Security Law and Practice, § 55:74 (there is ordinarily "no limit on a claimant's

supplementing the record on remand" after a sentence four or sentence six remand). One form of evidence that could quite helpful and persuasive does not appear to be in the record, and that is a report from the treating psychiatrist, Dr. Law. A detailed Mental RFC Assessment form completed by the treating physician and therapist often goes a long way to resolving ambiguities in the record.[1]

Plaintiff may also wish to ask that the ALJ and any VE consider any side effects of his medication on his ability to perform jobs. Plaintiff stated that his multiple drugs made him "very, very sleepy." Tr. 38. Limitations caused by side effects, including drowsiness, must be taken into consideration when determining whether a claimant is disabled. Crowley v. Apfel, 197 F.3d 194, 199 (5th Cir.1999); J.F.B. v. Commissioner, 2013 WL 1152722 (W.D. La.), adopted, 2013 WL 1152747 (W.D. La. 2013) (collecting cases).

Accordingly,

**IT IS RECOMMENDED** that the Commissioner's decision be reversed and, pursuant to sentence four of 42 U.S.C. § 405(g), this case be remanded to the Agency for further proceedings.

## Objections

---

[1] The "opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." Perez v. Barnhart, 415 F.3d 457, 465–66 (5th Cir. 2005). The treater's opinion on the nature and severity of her patient's impairment will be given "controlling weight" if it is well supported by medical evidence and not inconsistent with other substantial evidence. Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 15th day of December, 2016.

_____
Mark L. Hornsby
U.S. Magistrate Judge